IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | | |
|---|---|---|
| David Christian, III, | ) | C/A No. 3:12-1382-JFA-PJG |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| South Carolina Department of Labor, | ) | |
| Licensing, and Regulation; Catherine | ) | |
| Templeton; Samuel Wilkins; William "Ron" | ) | |
| Cook; Charles Ido; Holbrook "Ryan" Alvey, *in* | ) | |
| *their official and individual capacities*, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

Plaintiff David Christian, III, ("Christian"), filed this employment case raising claims pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e, et seq., and 42 U.S.C. § 1983, against Defendant South Carolina Department of Labor, Licensing, and Regulation; claims pursuant to 42 U.S.C. § 1983 and 42 U.S.C. § 1985 against the individual defendants in their official capacities; and a state law claim of civil conspiracy against the individual defendants in their individual capacities. This matter is before the court pursuant to 28 U.S.C. § 636(b) and Local Civil Rule 73.02(B)(2) DSC for a Report and Recommendation on the defendants' motions for summary judgment. (ECF Nos. 104, 106, 107, 108, 110, & 113.) Christian filed responses in opposition (ECF Nos. 126, 127, 128, 129, 130, & 131; Additional Attachments, ECF Nos. 132, 133, & 136), and the defendants filed reply memoranda (ECF Nos. 137, 138, 139, 140, 141, & 142). Having reviewed the parties' submissions and the applicable law, the court finds that the defendants' motions should be granted.

## BACKGROUND

The following facts are either undisputed or are viewed in the light most favorable to Christian, to the extent they find support in the record.  The South Carolina Department of Labor, Licensing and Regulation ("LLR") is a state agency that "is responsible for all administrative, fiscal, investigative, inspectional, clerical, secretarial, and license renewal operations and activities of the boards and commissions enumerated in Section 40-1-40."  S.C. Code Ann. § 40-1-50(A).  The parties agree that there are approximately forty professional and occupational boards and commissions for which LLR is responsible.  Within LLR, the Division of Professional and Occupational Licensing ("POL") provides the administrative support to these boards and commissions.  In 2008, then-Director Adrienne Youmans reorganized the POL Division by creating a new office, the Office of Licensure and Compliance ("OLC"), to improve efficiency and accuracy. Thus, the POL Division was divided into three offices—OLC, the Office of Board Services ("OBS"), and the Office of Investigations and Enforcement ("OIE")—with separate responsibilities. Specifically, "OLC was responsible for processing licensure applications and assisting applicants through the licensing process[;] OBS was . . . responsible for providing direct staff support to the individual boards and commissions and their members, including scheduling, preparing for, and staffing board and commission meetings[; and] OIE was . . . responsible for investigating complaints of misconduct by licensees."  (Order of Chief Administrative Law Judge Ralph K. Anderson, III, dated Mar. 28, 2012, ECF No. 110-3 at 2-3.)[1]

---

[1] The court notes that many of the exhibits cited in this Report and Recommendation may be found as attachments to more than one motion and/or response.  For ease of reference and in light of the fact that LLR's motion includes complete versions of all the exhibits cited in this Report and Recommendation, all ECF citations to exhibits for these pending motions refer to LLR's attachments to its motion for summary judgment.



Christian, an African-American male, began his career with LLR in 2003 as a Program Coordinator I performing in a licensing manager role over both initial and renewal licensing for the Board of Nursing. Around 2006, he was promoted to Program Coordinator II, which included additional job duties such as nurse compliance. When Youmans created OLC in 2008, Christian became the Program Manager II, or Assistant Deputy Director, for OLC.

Under the reorganization during which OLC was created, seventeen of the boards were initially transitioned to OLC, while the licensing functions of the remaining boards were to be transitioned to OLC at a future time in three or four phases. Ultimately, the transitioning of all forty boards was never completed. Prior to the creation of OLC, oversight over all licensing was performed by the boards individually or by groups of boards. The board administrators and staff assigned to each board were provided by LLR. Under OLC, board staff was performing many of the same duties, just on a different floor under the supervision of OLC.

The creation of OLC was opposed by some LLR employees and board members. Youmans recalled some board members complaining that they were not consulted prior to its creation and that many LLR employees complained about being reassigned to OLC. After its creation, OLC began organizing and processing the boards' paperwork. As a result, according to Christian, OLC discovered incomplete and unprocessed applications and compliance issues, and in one instance an OLC employee discovered over thirty thousand dollars in uncashed checks for license fees.

In June 2010, a legislator provided Youmans with a copy of an anonymous letter—which discovery revealed was drafted by two employees of LLR, Janet Baumberger and Tracy Gunter—alleging problems with OLC. Youmans found the letter to be full of lies, rumors, and innuendos and believed it had racial overtones because it raised issues with two African-American



employees.  Youmans did not act on the letter.  This letter was also sent to members of the General Assembly and the Legislative Audit Council.  Representative William E. Sandifer, III, the Chairman of the Labor, Commerce and Industry Committee, testified that he initially took no action on this letter but when it became apparent that other legislators desired action, at least one subcommittee hearing was held where Youmans was questioned about Christian's duties and salary.[2] Subsequently, on June 15, 2010, Representative Sandifer authored a letter to the Legislative Audit Council that was signed by twenty-seven legislators requesting an audit of LLR.[3] Christian, Youmans, and others believe that these actions were racially motivated.

In November of 2010, Representative Nikki Haley was elected Governor of South Carolina and on December 8, 2010, Governor-elect Haley held a press conference announcing Catherine Templeton as her choice to succeed Youmans as Director of LLR.  During the press conference announcing her appointment, Templeton expressed that LLR was to be a support agency for the individual boards and she intended to bring LLR back to the way it was before and stated, "[t]here's not any question that the POL Division or the Professional and Occupational Licensing boards . . . needs to be cleaned up."  (Templeton Dep. 143, ECF No. 110-24 at 37.)  Templeton indicated

---

[2] Sandifer also indicated that the complaints to the General Assembly reached the point that several legislators proposed removing some of the boards from LLR.  (Sandifer Dep. 36-38; 42-47, ECF No. 110-23 at 10-11, 12-13.)

[3] The audit, which was completed after the reduction in force of OLC, reported that almost all of the POL management staff outside of OLC and seven of the eight board administrators interviewed "expressed displeasure in the fashion that OLC was implemented and presented to the Agency" and "shared frustration with the poor quality of service that the licensing applicants received."  (LAC Audit at 22-23, ECF No. 110-2 at 28-29).  Christian disagrees with these findings.



that during her meeting prior to the press conference, Haley characterized LLR as "corrupt" and "struggling" and expressed concern over the delays in licensing.[4] (Id. at 127, ECF No. 110-24 at 33.)

Following the announcement and continuing after her confirmation as Director of LLR, Templeton held several meetings, ultimately speaking with an administrator or other member of each board and many employees of LLR. Prior to her confirmation, Templeton stated that she had spoken with Representative Sandifer, Bobby Creech from the Accountancy board, and Louis Costa from the Medical board; she also met with LLR employees Jim Knight and Rion Alvey,[5] and spoke with Youmans. Templeton was confirmed on January 13, 2011, and immediately held a meeting that included numerous LLR employees, during which Christian felt that Templeton was hostile and demeaning to him as well as other African-Americans.

Templeton continued to conduct meetings, some of which included Christian and concerned the licensing process. On January 20, 2011, Templeton met with Christian, Alvey, and Randy Bryant (Assistant Deputy Director of OBS) with regard to the restructuring of the licensing function, and based on that meeting Alvey and Bryant believed that OLC would be dismantled or disbanded. However, Christian's impression of that meeting was that although he understood that Templeton intended to restructure the agency, he believed that only the initial licensing would return to the boards while renewal and compliance would remain with OLC. Christian also testified that in his meetings with Templeton he described to Templeton the purpose of OLC, which included alleviating

---

[4] Christian stresses that when asked why she did not question what was "corrupt," Templeton testified: "I was sitting in the office with the governor elect of South Carolina having committed to her that I would help her do what she needed done. Whatever that, you know, whatever missions we needed to accomplish and there was a bank of press waiting, that wasn't the time to start backtracking." (Templeton Dep. 128-29, ECF No. 110-24 at 33-34).

[5] The record reflects that the proper spelling of Defendant Ryan Alvey's name is Rion.



problems that existed before its creation by adding tracking mechanisms for applications, adding

procedures to prevent losing track of monies or uncollected bad checks, and adding a work flow

process to applications to prevent past issues. Further, by e-mail dated January 21, 2011 to Christian,

Alvey, and Bryant, Templeton summarized their meeting, stating specifically as follows:

> Randy, Rion, and David,
>
> I want to be clear about our conversation yesterday. The three of you should be working together to come up with a process that is efficient and holds each area accountable for initial licensing. My idea is to move it back under each Board and to organize multiple boards under one set of "staff." I need to know:
>
> What the appropriate, full compl[e]ment would be for each Board Administrator. In other words, how many boards should each be assigned to ensure that everyone has a full work load, is cross trained on the Board for which they are responsible, and no one is overwhelmed unnecessarily during any period of time throughout the year. I recognize that some Administrators will have more Boards than others. Make this decision based on time, workload, similarity in function, etc.
>
> . . . .
>
> Between the three of you, you should have the expertise and history to hammer this out with VERY little involvement from any other personnel. I do not want to worry any employees in any of the areas and I do not want you to discuss or detail where specific people should be assigned or even physically sit. The structure is all that I am concerned about.

(ECF No. 110-5.) Ultimately, Templeton determined that although the theory of colonizing the

licensing function was not a bad idea, in practice it was "a horrible failure" and was probably the

reason that the licensing process had slowed down significantly or was not happening at all.

(Templeton Dep. 152, ECF No. 110-24 at 39.) Templeton determined that the employees that were

under the boards doing licensure and compliance functions needed to go back under the boards.

After she reached that determination, Templeton turned from seeking input from Christian, Alvey,

and Bryant to Lynn Rivers (LLR Human Resources Director), Sam Wilkins (State Human Resources



Director), Heather Pope (a manager with the State Human Resources Division), and outside counsel. (Templeton Dep. 417-18, ECF No. 110-24 at 106; see also id. at 410, ECF No. 110-24 at 104.) Additionally during this time, in February 2011, Bryant was asked to retire in February 2011.[6]

The OLC reduction in force ("RIF") was one of three LLR RIFs approved on March 10, 2011, which was outlined by a RIF plan. The other RIFs were for the Customer Call Center and an administrative unit in OBS. LLR's RIF policy requires LLR to select a "competitive area" for the RIF, which is the area from which employees are selected for layoff. Pursuant to the RIF Plan, employees are ranked for layoff by "retention points" that are computed using various factors, including years of service and performance. Employees may have rights to "bump" or displace other employees within the competitive area but may not displace employees outside the competitive area. Also, employees have recall rights to positions that become available within their competitive area; however, they do not have preferential hiring rights for jobs that open elsewhere. If an employee is rehired within twelve months, he or she retains state seniority. Notably, the competitive area for the OLC RIF was all of OLC because it was being eliminated.

The OLC RIF Plan was drafted and submitted to the South Carolina Budget and Control Board to be approved for "procedural correctness," which involves reviewing "whether the plan seems to conform with the requirements of the [RIF] policy." (Wilkins Dep. 28, ECF No. 110-25 at 9.) The OLC RIF Plan was approved and included a total of sixty employees, of which twelve were probationary and temporary employees, rehired retired employees, and TERI employees. This

---

[6] Relying on Alvey's testimony, Christian suggests that "Templeton wanted to cut ties with [Bryant] because of a federal investigation involving OBS employees." (Pl.'s Mem. Opp'n Summ. J. at 9, ECF Nos. 126, 127 128, 129, 130, 131 at 9) (citing Alvey Dep. 98-101). Christian argues that OLC oversight identified the issue that was the subject of the investigation, which previously had gone unnoticed.



left forty-eight OLC employees involved in the layoff. LLR calculated retention points for the forty-eight employees to select those who would be offered open administrative positions in OBS following the RIF. All permanent employees of OLC, save four, were offered Administrative Assistant positions performing licensing or compliance functions with the various boards, a position listed at a Band 4 pay level. (See generally OLC RIF Plan, ECF No. 110-6.)

The RIF Plan lists the race, gender, and age of the covered employees and, pertinent here, reveals that of the forty-eight covered employees, twelve are white, thirty-two are African-American, and four are listed as "other." The other two RIFs approved on the same day indicated that all four terminated individuals in the OBS administrative section are white and that five of the individuals terminated in the Customer Call Center are white and five are African-American.

For Christian (at Band 8) and several others, an administrative assistant position would entail making less money but involve no loss of seniority or benefits and included eligibility to apply to other posted positions at LLR. Christian ultimately accepted a position as an administrative assistant with the nursing board.

In March 2011, Christian applied for three positions. Alvey's position of assistant deputy director over OIE became vacant when Templeton appointed him to the position of Deputy Director of POL soon after her confirmation. Additionally, Bryant's departure resulted in a vacancy for the position of assistant deputy director over OBS. Mark Dorman had been acting as the interim assistant deputy director over OIE, and Defendant Charles Ido was appointed as the interim assistant deputy director over OBS. Christian applied for these positions as well as an open assistant deputy director position to supervise inspectors in the Drug Diversion Program. This program was managed by Ron Cook, but as part of a reorganization, all of the premises inspectors were transferred from

OBS to the Drug Diversion division and the job was upgraded to an assistant deputy director position and posted.

Christian was interviewed for all three jobs by a panel consisting of Alvey and Assistant General Counsel Lynne Rogers, but the positions were ultimately awarded to Dorman (assistant deputy director over OIE), Ido (assistant deputy director over OBS), and Cook (assistant deputy director supervising inspectors in the Drug Diversion Program). Christian did not apply for any other openings and ultimately resigned effective January 16, 2012.

## DISCUSSION

### A.    Summary Judgment Standard

Summary judgment is appropriate only if the moving party "shows that there is no genuine dispute as to any material fact and the [moving party] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A party may support or refute that a material fact is not disputed by "citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* [dispute] of *material fact*." Ballinger v. N.C. Agric. Extension Serv., 815 F.2d 1001, 1005 (4th Cir. 1987) (emphasis in original) (internal quotation marks and citation omitted). A fact is "material" if proof of its existence or non-existence would affect the disposition of the case under the applicable law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986). An issue of material fact is "genuine" if the evidence offered is such that a reasonable jury might return a verdict for the non-movant. Id. at 257.



In discrimination cases, a party is entitled to summary judgment if no reasonable jury could rule in the non-moving party's favor.  Dennis v. Columbia Colleton Med. Ctr., Inc., 290 F.3d 639, 645 (4th Cir. 2002).  The court cannot make credibility determinations or weigh the evidence, but the court should examine uncontradicted and unimpeached evidence offered by the moving party. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000).  The court must determine whether a party's offered evidence is legally sufficient to support a finding of discrimination and look at the strength of a party's case on its own terms.  See id. at 148 (stating that "[c]ertainly there will be instances where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational fact-finder could conclude that the action was discriminatory").

**B.     Plaintiff's Claims**

**1.     Claims of Civil Conspiracy Pursuant to 42 U.S.C. § 1983 and § 1985**

Christian asserts claims of civil conspiracy pursuant to 42 U.S.C. § 1983 and § 1985 seeking monetary relief against the individual defendants only in their official capacities.  However, the Eleventh Amendment states that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."  U.S. Const. amend. XI. Sovereign immunity protects both the State itself and its agencies, divisions, departments, officials, and other "arms of the State."  See Will v. Michigan Dep't of State Police, 491 U.S. 58, 70 (1989); see also Regents of the Univ. of California v. Doe, 519 U.S. 425, 429 (1997) ("[I]t has long been settled that the reference [in the Eleventh Amendment] to actions 'against one of the United States' encompasses not only actions in which a State is actually named as the defendant, but also certain



actions against state agents and state instrumentalities."). As arms of the state, these defendants, who were all employees of state agencies, are entitled to sovereign immunity and cannot constitute "persons" under § 1983 in that capacity. See Will, 491 U.S. at 70-71. Although a State may waive sovereign immunity, Lapides v. Board of Regents, 535 U.S. 613 (2002), the State of South Carolina has specifically denied this waiver for suit in federal district court. See S.C. Code Ann. § 15-78-20(e). Accordingly, these defendants are immune from suit with regard to these claims. See Will, 491 U.S. at 70-71; see also Quern v. Jordan, 440 U.S. 332, 343 (1979) (recognizing that Congress did not override the Eleventh Amendment when it created the remedy found in 42 U.S.C. § 1983 for civil rights violations). Therefore, the individual defendants are entitled to summary judgment on these claims.

### 2.     Claim of State Law Civil Conspiracy

Christian also asserts a claim of civil conspiracy under state law against the individual defendants in their individual capacities. Under South Carolina law, "[a] civil conspiracy is a combination of two or more persons joining for the purpose of injuring and causing special damage to the plaintiff." McMillan v. Oconee Mem'l Hosp., Inc., 626 S.E.2d 884, 886 (S.C. 2006); see also Pye v. Estate of Fox, 633 S.E.2d 505, 511 (S.C. 2006) (listing the three elements of a civil conspiracy). "A claim for civil conspiracy must allege additional acts in furtherance of a conspiracy rather than reallege other claims within the complaint," and "because the quiddity of a civil conspiracy claim is the special damage resulting to the plaintiff, the damages alleged must go beyond the damages alleged in other cause of action." Hackworth v. Greywood at Hammett, LLC, 682 S.E.2d 871, 874 (S.C. 2009) (internal citations omitted). Finally, pursuant to South Carolina law, with regard to any civil conspiracy claim pending between July 1, 2014 and June 30, 2015 that is



based upon a personnel or employment action or decision regarding a plaintiff employee, a government employee named as a defendant is immune from suit from such a claim if the court finds that the defendant government employee was acting within the scope of his or her official duties. See S.C. 2014-2015 Appropriation Bill, Act No. 286, H. 4701, Proviso 117.92 (eff. July 1, 2014).

The defendants present several reasons that they are each entitled to summary judgment on this claim. Upon thorough review of the parties's filings and the applicable law, the court agrees. No reasonable jury could find a conspiracy based on the evidence presented.[7] Specifically, despite the voluminous record in this case, in response to the defendants' well supported motions, Christian relies upon the identical evidence to support his race discrimination and failure to promote claims against LLR as he does to support his claims of conspiracy. (See generally Pl.'s Resp. Opp'n LLR's Mot. Summ. J., ECF No. 126.) Moreover, Christian has failed to identify or otherwise provide evidence of any special damages he purportedly suffered due to the individual defendants' actions which are beyond the alleged damages he purportedly suffered as a result of his claims pursuant to Title VII against LLR. See, e.g., Vaught v. Waites, 387 S.E.2d 91 (S.C. Ct. App. 1989) (finding no genuine issue of material fact where Plaintiff's testimony was contrary to the allegations of an overt act in the Complaint); see also Hackworth, 682 S.E.2d at 874. Finally, despite his speculative and conclusory allegations to the contrary, Christian has not made any showing that the individual

---

[7] Although Christian points out in his response to the defendants' summary judgment motions that the court previously ruled that Christian had adequately pled a state law claim of civil conspiracy, that ruling regarding Defendant Templeton's Rule 12(b)(6) motion does not avail him at the summary judgment stage, where he is required to actually present proof supporting his allegations. See, e.g., Nutrition & Fitness, Inc. v. Mark Nutritionals, Inc., 202 F. Supp. 2d 431, 436 (M.D.N.C. 2002) (stating that "a Rule 12(b)(6) motion has a different standard of review than a summary judgment motion" and observing that a court's ruling denying a moving party's motion to dismiss a claim does not prevent the moving party from challenging the sufficiency of the claim again through a summary judgment motion at the appropriate phase of the litigation).



defendants acted outside the scope of their official duties; thus, they are immune from Christian's claim. <u>See</u> S.C. 2014-2015 Appropriation Bill, Act No. 286, H. 4701, Proviso 117.92; S.C. Code Ann. § 15-78-30(I) (defining "scope of official duty"). Accordingly, his civil conspiracy claim against the individual defendants fails as a matter of law.

### 3.    Title VII Claims

#### i.    Avenues of Proof in Employment Cases

A plaintiff asserting a claim of unlawful employment discrimination may proceed through two avenues of proof. First, he may establish his claims by presenting "present sufficient evidence, direct or circumstantial, 'for a reasonable jury to conclude, by a preponderance of the evidence, that race, color, religion, sex, or national origin was a motivating factor for any employment practice.' " <u>Hill v. Lockheed Martin Logistics Mgmt., Inc.</u>, 354 F.3d 277, 284-85 (4th Cir. 2004) (*en banc*) (quoting <u>Desert Palace Inc. v. Costa</u>, 539 U.S. 90 (2003)).

Alternatively, a plaintiff may rely on circumstantial evidence and proceed under the <u>McDonnell Douglas</u> burden-shifting framework. <u>Warch v. Ohio Casualty Ins. Co.</u>, 435 F.3d 510, 520 (4th Cir. 2006); <u>see</u> <u>also</u> <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 802 (1973). Pursuant to this framework, once the plaintiff establishes a *prima facie* case of discrimination, the burden shifts to the defendant to produce evidence of a legitimate, nondiscriminatory reason for the adverse action. <u>Merritt v. Old Dominion Freight</u>, 601 F.3d 289, 294 (4th Cir. 2010) (Title VII). The defendant's burden "is a burden of production, not persuasion." <u>Reeves</u>, 530 U.S. at 142. Once a defendant meets this burden by producing affidavits or testimony demonstrating a legitimate, nondiscriminatory reason, "the <u>McDonnell Douglas</u> framework—with its presumptions and

burdens—disappear[s], and the sole remaining issue [is] discrimination *vel non*." Id. (internal quotation marks and citations omitted).

In other words, if the defendant meets the burden to demonstrate a legitimate, nondiscriminatory reason, the plaintiff must demonstrate by a preponderance of the evidence that the proffered reason was " 'not its true reason[], but [was] a pretext for discrimination.' " Merritt, 601 F.3d at 294 (quoting Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253 (1981)). Accordingly, the plaintiff's burden of demonstrating pretext " 'merges with the ultimate burden of persuading the court that [the plaintiff] has been the victim of intentional discrimination.' " Merritt, 601 F.3d at 294 (quoting Burdine, 450 U.S. at 256) (alterations in original); see also Diamond v. Colonial Life & Accident Ins. Co., 416 F.3d 310, 319 (4th Cir. 2005) (Title VII & 42 U.S.C. § 1981). To meet this "merged" burden, the employee may prove by a preponderance of the evidence that the decision maker's affidavit is untrue or that the employer's proffered explanation is unworthy of credence. Burdine, 450 U.S. at 256.

"[A] plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, *may* permit the trier of fact to conclude that the employer unlawfully discriminated." Reeves, 530 U.S. at 148. However, "if the record conclusively reveal[s] some other, nondiscriminatory reason for the employer's decision, or if the plaintiff create[s] only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred," summary judgment is appropriate. Id. Accordingly, the court must evaluate "the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence

PJG

that supports the employer's case and that properly may be considered on a motion for judgment as a matter of law." <u>Id.</u> at 148-49.

> Importantly,
>
> > [r]egardless of the type of evidence offered by a plaintiff as support for [his] discrimination claim (direct, circumstantial, or evidence of pretext), or whether [he] proceeds under a mixed-motive or single-motive theory, "[t]he ultimate question in every employment discrimination case involving a claim of disparate treatment is whether the plaintiff was the victim of intentional discrimination." <u>Reeves</u>, 530 U.S. at 153 (2000); <u>see</u> <u>Burdine</u>, 450 U.S. at 256.  To demonstrate such an intent to discriminate on the part of the employer, an individual alleging disparate treatment based upon a protected trait must produce sufficient evidence upon which one could find that "the protected trait . . . actually motivated the employer's decision." <u>Reeves</u>, 530 U.S. at 141 (internal quotation marks omitted).  The protected trait "must have actually played a role in the employer's decisionmaking process and had a determinative influence on the outcome."  <u>Id.</u> (internal quotation marks and alterations omitted); <u>cf.</u> <u>Price Waterhouse</u>, 490 U.S. at 277 (O'Connor, J., concurring) (noting that "statements by nondecisionmakers, or statements by decisionmakers unrelated to the decisional process itself [do not] suffice to satisfy the plaintiff's burden" of proving discrimination); <u>Koski v. Standex Int'l Corp.</u>, 307 F.3d 672, 678 (7th Cir. 2002) (noting that the pertinent inquiry is whether the decisionmaker, as opposed to other managers or subordinates, evaluated the aggrieved employee based upon discriminatory criteria).

<u>Hill</u>, 354 F.3d at 286; <u>see also</u> <u>Merritt</u>, 601 F.3d at 294-95 ("Notwithstanding the intricacies of proof schemes, the core of every [discrimination] case remains the same, necessitating resolution of the ultimate question of . . . whether the plaintiff was the victim of intentional discrimination.").

### ii.  Reduction in Force

Under either avenue of proof, for the reasons that follow the court finds that the defendants are entitled to summary judgment on this claim.[8]  Specifically, no reasonable jury could find based on the record before the court that Christian was the victim of intentional discrimination.  Moreover,

---

[8] The court's discussion in this section is equally applicable whether Christian's claim is analyzed as challenging his termination as a result of the RIF or alleging a disparate impact as a result of the RIF.



with regard to the <u>McDonnell Douglas</u> burden-shifting framework, assuming arguendo that Christian has established a *prima facie* case, the court finds that LLR has offered a legitimate, nondiscriminatory reason for the RIF, which Christian has failed to demonstrate was a pretext for discrimination.

As summarized above, the evidence reveals that Templeton, as the new director of LLR, decided to reorganize LLR based on numerous complaints that the licensing arm was not functioning properly. Ultimately, LLR conducted a RIF that eliminated the recently created OLC, which Templeton believed was the appropriate way to accomplish the reorganization of the functions of OLC.[9] Therefore, the court finds that LLR has presented a legitimate, nondiscriminatory reason for the OLC RIF.

Despite extensive discovery and a voluminous record before the court, Christian has failed to demonstrate that LLR's reason for laying off Christian was pretextual or that Christian was the victim of intentional discrimination.[10] The majority of Christian's support for his position that LLR used a forbidden consideration in making its decision consists of conclusory or speculative allegations or testimony from individuals who felt or believed, without any support, that the actions were racially motivated. <u>See</u> <u>Thompson v. Potomac Elec. Power Co.</u>, 312 F.3d 645, 649 (4th Cir. 2002) ("Conclusory or speculative allegations do not suffice, nor does a mere scintilla of evidence in support of [the nonmoving party's] case.") (internal quotation marks omitted). For example,

---

[9] Christian's administrative challenges to the RIF were unavailing. The Honorable Ralph K. Anderson, III, Chief Judge of the South Carolina Administrative Law Court, affirmed the South Carolina Budget and Control Board's determination that LLR properly or consistently applied its RIF policy with regard to Christian in conducting the OLC RIF. (<u>See</u> <u>generally</u> ECF No. 110-3.)

[10] This discussion and analysis also applies to Christian's claims alleging LLR violated Title VII in failing to promote him and in subjecting him to an allegedly hostile work environment.



Christian argues that the stated reasons for the RIF are implausible, relying on Templeton's appointment speech that indicated that she would eliminate OLC, that the evidence shows Templeton met with other individuals about OLC, that Alvey indicated to Christian that Templeton was carrying out orders to remove OLC and Christian, that the transition team did not contact Youmans before Templeton's confirmation, that there was not a financial reason for the RIF, and how quickly the RIF occurred after Templeton was confirmed. Christian fails to explain, however, how these facts, even if true, undermine the stated reason for the RIF.

Christian also relies on testimony from several individuals (some of whom filed related actions) who believed the RIF was racially motivated and that African-Americans had difficulty advancing within LLR. He argues, without support, that OBS should have been included in the RIF, but that the RIF was limited to OLC to protect the white management within OBS and hide the racial motivations. These arguments consist wholly of speculation, subjective belief, and rumors which are insufficient to establish a claim of race discrimination. See Thompson, 312 F.3d at 649; Mitchell v. Toledo Hospital, 964 F.2d 577, 584-85 (6th Cir. 1992) (finding that even considering a hearsay affidavit, "the statements contained therein are nothing more than rumors, conclusory allegations and subjective beliefs which are wholly insufficient evidence to establish a claim of discrimination as a matter of law"). Similarly, as pointed out by LLR, much of the "evidence" that Christian relies on is not presented in a form that would be admissible evidence.[11] See Fed. R. Civ. P. 56(c).

Christian's argument that it is also implausible that OLC was not as efficient as the old system is similarly unavailing. This argument appears to be based on Youmans's and Christian's

---

[11] To the extent that Christian relies on allegations that Cook made racially charged comments in the workplace and circulated an inappropriate and allegedly racist video, there is no evidence in the record from a jury could find Cook was involved in the OLC RIF decision.



opinions about OLC.  Christian argues that OLC provided oversight, pointing out an instance in which an OLC employee discovered over thirty-thousand dollars in uncashed checks for license fees and that OLC spent substantial time organizing and processing paperwork that had not been properly handled.  Contrary to Christian's belief of implausibility, the record reveals ample evidence that others disagreed with his opinion.  As argued by LLR, "[i]t is undisputed that there was an enormous practical and political battle over whether OLC was the appropriate approach [to most efficiently handle licensing and compliance].  Plaintiff lost the battle when Templeton, as a new Director, decided to abolish OLC.  Reassigning the functions of OLC was one of several perfectly reasonable business-related alternatives available to her."  (LLR's Reply Supp. Summ. J. at 8, ECF No. 138 at 8.)  Moreover, even if LLR's decision was unwise or incorrect, Christian has failed to produce any evidence that the reason was a pretext for race discrimination.  See DeJarnette v. Corning, Inc., 133 F.3d 293, 298-99 (4th Cir. 1998) (stating that "Title VII is not a vehicle for substituting the judgment of a court for that of the employer" and that "this Court does not sit as a kind of super-personnel department weighing the prudence of employment decisions made by firms charged with employment discrimination") (internal quotation marks and citations omitted); Henson v. Liggett Corp., 61 F.3d 270, 277 (4th Cir. 1995) (ADEA) ("We have recognized the importance of giving an employer the latitude and autonomy to make business decisions, including work place reorganization, as long as the employer does not [discriminate].").

Christian also appears to argue discriminatory intent in that many positions at LLR are obtained through preselection, and pointing to examples of the allegedly preselected individuals who are white.  However, Christian has provided no proof that the alleged preselections were racially motivated.  The law is well settled that preselection of a candidate for a position, without proof that



the preselection was racially motivated, does not violate Title VII.  See Anderson v. Westinghouse Savannah River Co., 406 F.3d 248, 271 (4th Cir. 2005) (holding that evidence that a supervisor preselected an employee for promotion is insufficient for a jury to conclude that the employer's explanation was a pretext for race discrimination); Jackson v. Winter, 497 F. Supp. 2d 759, 770 (4th Cir. 2007) ("Preselection, even if accompanied by subsequent manipulation to guarantee that the preselected candidate gets the position over more qualified candidates, does not equate automatically to discrimination.").  As the United States Court of Appeals for the Fourth Circuit has noted, evidence of preselection is not probative of discriminatory intent because it "work[s] to the detriment of all applicants for the job, black and white alike."  Blue v. U.S. Dep't of the Army, 914 F.2d 525, 541 (4th Cir. 1990).  Even viewing this argument with those discussed above, Christian has failed to demonstrate LLR's actions were pretextual.

Finally, Christian focuses on the percentage of the individuals subjected to the OLC RIF that are African-American and the percentage of African-Americans in the OLC management holding Band 5 or higher positions that were offered lower-paying administrative assistant positions. Specifically, Christian points out that two-thirds of the employees within OLC were African American and two-thirds of the employees within OLC that were earning a salary above Band 4 were African American to support his contention that the elimination of OLC was racially motivated. However, statistics without context are insufficient to show pretext.  See Carter v. Ball, 33 F.3d 450, 457 (4th Cir. 1994) (stating that judges may disregard statistical evidence offered without expert testimony as to the methodology or relevance to the plaintiff's claim); see also Vaughan v. MetraHealth Cos., Inc., 145 F.3d 197, 203 (4th Cir. 1998), overruled in part on other grounds by Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133 (2000); see generally Moultrie v. Martin,



690 F.2d 1078, 1082-83 (4th Cir. 1982) (discussing the appropriate statistical methodology to use when drawing conclusions from statistical evidence).

Accordingly, based on all of the foregoing, Christian cannot show on the record before the court a reasonable inference that LLR's reason for conducting the OLC RIF and terminating Christian was pretextual. Even if Christian's evidence were found sufficient to reject LLR's explanation, the court concludes that based on the evidence in the record, no reasonable jury could find that the OLC RIF and Christian's termination was discriminatory. See Reeves, 530 U.S. at 148. Christian cannot ultimately prove that he was the victim of intentional discrimination. See Merritt, 601 F.3d at 294-95.

### iii. Failure to Promote

Similarly, LLR is entitled to summary judgment on Christian's failure-to-promote claim. As stated above, in March 2011, Christian applied for three positions for which he was not selected: assistant deputy director over OIE, assistant deputy director over OBS, and assistant deputy director supervising inspectors in the Drug Diversion Program. Alvey (white male) and Rogers (African-American female) interviewed Christian for all three jobs and rated all interviewees on a scale of one to five in eight categories. Alvey gave Christian a total of thirty-four points out of forty, and Rogers gave him thirty-three points out of forty. The positions were ultimately awarded to Dorman (assistant deputy director over OIE), Ido (assistant deputy director over OBS), and Cook (assistant deputy director supervising inspectors in the Drug Diversion Program), each of whom received a total of forty points from both Alvey and Rogers.

With regard to Dorman, Rogers commented that he "[h]as over 30 years at LLR, [h]as supervised investigations for all [Boards], Payment of wages—child labor," and Alvey stated that



"Dorman has all of the required training/experience/and skills. Has already acted as the ADD over OIE for 2 years when the former ADD was put on temporary assignment. Has 31 years of wages/child labor." (Attachment to Alvey Aff., ECF No. 110-13 at 11, 12.) The record also reveals that Ido worked as an agent for the United States Secret Service for twenty years. Afterwards, Ido began working at LLR (or its predecessor) where he spent fourteen years as a supervisor in Investigations and approximately seven years as Chief of Investigations of OIE. (Alvey Aff. ¶ 6, ECF No. 110-13 at 2-3.) The record shows that Cook worked for twenty-seven years with the South Carolina Law Enforcement Division where he conducted investigations and managed other agents. When Cook applied for the position, he had already been successfully managing the Drug Diversion Program, which was one part of the newly created assistant deputy director position. (Id. ¶ 8, ECF No. 110-13 at 3.)

Therefore, assuming as LLR has that Christian can meet the *prima facie* test for this claim, the court finds based on the foregoing that LLR has offered a legitimate, nondiscriminatory reason for selecting each individual over Christian for these three positions in that LLR believed that each was better qualified for the open position. Christian cannot establish that LLR's stated reason was pretextual for race discrimination.

"A plaintiff alleging a failure to promote can prove pretext by showing that he was better qualified, or by amassing circumstantial evidence that otherwise undermines the credibility of the employer's stated reasons." Heiko v. Colombo Savings Bank, F.S.B., 434 F.3d 249, 259 (4th Cir. 2006). In assessing relative qualifications, it is based on the criteria that the employer has established as relevant to the position in question. Id.

> When a plaintiff asserts job qualifications that are similar or only slightly superior to those of the person eventually selected, the promotion decision remains vested in the sound business judgment of the employer. But where . . . the plaintiff has made a strong showing that his qualifications are demonstrably superior, he has provided sufficient evidence that the employer's explanation may be pretext for discrimination.

Id. at 261-62 (internal citations omitted).

Christian argues that LLR's proffered reason is unworthy of credence and pretext for race discrimination because (1) he was only interviewed once for all three positions, (2) preselection was evident as the positions were awarded to the persons who were serving as the interim for that position or were already performing those duties, (3) he was issued one score sheet for all three positions, appearing to argue that the relevant experience and education/training for each position would vary and should be separately assessed, and (4) that Alvey's score sheet reveals that two of the rating of "four" were changed to "five." The court finds these arguments do not demonstrate pretext. Notably, Christian does not argue that he was demonstrably superior to those who received the positions at issue. Moreover, Christian's arguments in no way undermine LLR's stated reasons for awarding the positions to Dorman, Ido, and Cook. Based on the evidence in the record, no reasonable jury could conclude that LLR's failure to promote Christian to these positions was discriminatory or that he was the victim of intentional discrimination. See Reeves, 530 U.S. at 148; Merritt, 601 F.3d at 294-95.

### iv.    Harassment

Title VII prohibits creating or allowing a hostile work environment based on race, color, religion, sex, or national origin. See Baqir v. Principi, 434 F.3d 733, 746 n.14 (4th Cir. 2006). Such an environment exists "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or persuasive to alter the conditions of the victim's



employment and create an abusive working environment." Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993) (internal quotation marks & citations omitted) (Title VII). However, "[w]orkplaces are not always harmonious locales." E.E.O.C. v. Sunbelt Rentals, Inc., 521 F.3d 306, 315-16 (4th Cir. 2008) (Title VII). Moreover, federal employment statutes are not "general civility code[s]." Oncale v. Sundower Offshore Servs., Inc., 523 U.S. 75, 80 (1998) (Title VII); Shirer v. Tri-County Elec. Co-op., Inc., C/A No. 5:07-1156-MBS, 2009 WL 2900767, at *8 (D.S.C. Sept. 9, 2009) (Title VII & ADEA).

To make out a hostile work environment claim under federal anti-discrimination laws, a plaintiff must show that "(1) he experienced unwelcome harassment; (2) the harassment was based on his race, color, religion, national origin, or age; (3) the harassment was sufficiently severe or pervasive to alter the conditions of his employment and to create an abusive atmosphere; and (4) there is some basis for imposing liability on the employer." Baqir, 434 F.3d at 745-46.

To meet the second element, a plaintiff must show that "but for" one of these protected traits, he would not have been a victim of harassment. See Causey v. Balog, 162 F.3d 795, 801 (4th Cir. 1998) (Title VII & ADEA). The federal anti-discrimination statutes do not protect employees from hostility and abuse from their supervisors unless the objectionable conditions occur because of a protected characteristic. See Graham v. Prince George's Cnty., 191 F. App'x 202, 204 (4th Cir. 2006) (finding the district court did not err in determining that "although [the] facts reflected an unpleasant working environment, they did not support a hostile one based on an unlawful characteristic"); see also Oncale, 523 U.S. at 80; Shirer, 2009 WL 2900767, at *8.

Moreover, in a hostile work environment case, the behavior must rise to the standard of being so "severe" or "pervasive" so as to create an abusive working environment. Harris, 510 U.S. at 21;



see also Baqir, 434 F.3d at 746.  When analyzing this element, courts examine the totality of the circumstances, considering such factors as the frequency of the discriminatory conduct and its severity; whether it is physically threatening or humiliating or merely constitutes offensive verbal statements; and whether it unreasonably interferes with an employee's work performance. See Harris, 510 U.S. at 23; Hopkins v. Baltimore Gas & Elec. Co., 77 F.3d 745, 753 (4th Cir. 1996); see also Sunbelt Rentals, Inc., 521 F.3d at 315-16 (stating that complaints that would objectively give rise to bruised or wounded feelings or incidents that are premised on nothing more than rude treatment, callous behavior, or a routine difference of opinion and personality conflict will not satisfy the severe or pervasive standard).

Here, Christian cannot meet the *prima facie* test for harassment or hostile work environment. Christian appears to argue that he was subjected to a hostile work environment based on Templeton's demeanor towards him, which he alleges included singling him out, grilling him, and causing him to falsely believe that OLC would remain intact.  He also argues that the record is full of racial remarks.[12]  The court finds that these alleged incidents, taken as true, are insufficient as a matter of law to support a hostile work environment claim.  They fail to establish that any alleged harassment was severe and pervasive, as they are sporadic and isolated, and, with regard to Templeton, do not appear to be overtly offensive based on race.  See Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998) (stating that "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment") (internal quotation marks and citations omitted); compare E.E.O.C. v. Central Wholesalers, Inc., 573

---

[12] As indicated above, the support for many of these alleged remarks appear to be based on inadmissable evidence.



F.3d 167, 176 (4th Cir. 2009) (finding alleged gender-based and race-based harassment was sufficiently severe or pervasive where co-workers referred to women as b* * *hes and a co-worker in a cubicle next to the plaintiff had Playboy items, watched pornography in front of her, had a pornographic screensaver, and placed a screwdriver in a Halloween decoration in a sexual manner and where co-workers used racial epithets, some directed at the plaintiff, and two co-workers "kept blue-colored mop-head dolls in their offices which they had hanging by nooses tied around the dolls' necks") and Spriggs v. Diamond Auto Glass, 242 F.3d 179 (4th Cir. 2001) (holding that supervisor's constant, even daily, use of racial epithets was sufficiently severe or pervasive to survive summary judgment) and Smith v. First Union Nat'l Bank, 202 F.3d 234 (4th Cir. 2000) (concluding that "a barrage of threats and gender-based insults" that the plaintiff's supervisor directed at her and that occurred more than thirty times in the first few weeks of the plaintiff's employment was sufficiently severe or pervasive to survive summary judgment) and Amirmokri v. Baltimore Gas & Elec. Co., 60 F.3d 1126, 1131 (4th Cir. 1995) (finding the alleged harassment was sufficiently severe or pervasive because an Iranian plaintiff was called "names like 'the local terrorist,' a 'camel jockey' and 'the Emir of Waldorf' " on an almost daily basis) with McNeal v. Montgomery Cnty., Md., 307 F. App'x 766, 776 (4th Cir. 2009) (stating that "five accusations of theft and [the supervisor's] requirement that [the plaintiff] bring in doctor's notes and provide for more detail about his sick leave hardly rise to the level of 'hostile or abusive' treatment") and Hopkins, 77 F.3d 745 (acknowledging that the conduct and sexual comments at issue were "inappropriately forward," but finding the alleged harassment was insufficiently severe or pervasive where the conduct occurred over several years, most sexual comments and conduct occurred in group settings, and the supervisor never "made an overt sexual proposition or touched [the plaintiff] in a sexual manner").

Christian has failed to identify any incidents that would rise to the level of showing that his workplace was permeated with discriminatory intimidation, ridicule, and insult that was sufficiently severe or persuasive to alter the conditions of the victim's employment and create an abusive working environment based on his race.  See Harris, 510 U.S. at 23.

### v.    Forced Retirement

To the extent that Christian seeks to raise a claim of constructive discharge based on his resignation effective January 16, 2012, the defendant argues that such a claim is not properly before the court as Christian failed to exhaust his administrative remedies with regard to this claim.  The court agrees.

Before filing suit under Title VII, a plaintiff must exhaust his administrative remedies by bringing a charge with the EEOC.  42 U.S.C. § 2000e-5(f)(1); see also Smith v. First Union Nat'l Bank, 202 F.3d 234, 247 (4th Cir. 2000).  In the employment discrimination context, courts have interpreted statutory requirements to exhaust administrative remedies to mean that each discrete incident of discriminatory treatment must be administratively exhausted.  Martinez v. Potter, 347 F.3d 1208, 1210 (10th Cir. 2003) (citing Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 122 (2002)); Jones v. U.P.S., Inc., 502 F.3d 1176, 1186 (10th Cir. 2007).  "A plaintiff's EEOC charge defines the scope of [his] subsequent right to institute a civil suit."  Smith, 202 F.3d at 247.  Only those claims stated in the initial administrative charge, those reasonably related to the original complaint, and those developed by reasonable investigation of the original complaint may be maintained in a subsequent lawsuit.  Evans v. Technologies Applications & Serv. Co., 80 F.3d 954, 963 (4th Cir. 1996) (affirming the district court's dismissal of some of the plaintiff's claims because they were outside the scope of her original EEOC charge and were therefore time barred).

Page 26 of  28



In this case, Christian filed a charge of discrimination with the South Carolina Human Affairs Commission and the Equal Employment Opportunity Commission on July 28, 2011 alleging that he was harassed and "demoted" due to his race.  On September 15, 2011, LLR submitted a position letter responding to these allegations.  On January 16, 2012, Christian resigned.  On January 19, 2012, the Human Affairs Commission issued a right to sue letter to Christian, and on April 9, 2012 the Equal Employment Opportunity Commission issued a right to sue letter to Christian.  There is no evidence that Christian sought to amend his charge or filed a new charge of discrimination based on this new discrete act.  Therefore, LLR is entitled to summary judgment on this claim.

## RECOMMENDATION

All of Christian's claims fail as a matter of law.  In essence, Christian cannot establish that he was the victim of unlawful discrimination or conspiracy rather than a victim of adverse politics or circumstances.  The court therefore recommends that the defendants' motions for summary judgment (ECF Nos. 104, 106, 107, 108, 110, & 113) be granted.

Paige J. Gossett
UNITED STATES MAGISTRATE JUDGE

August 8, 2014
Columbia, South Carolina

*The parties' attention is directed to the important notice on the next page.*

Page 27 of 28

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge.  Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections.  "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.' "  Diamond v. Colonial Life & Acc. Ins. Co., 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); see Fed. R. Civ. P. 6(a), (d).  Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
901 Richland Street
Columbia, South Carolina 29201

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.**  28 U.S.C. § 636(b)(1); Thomas v. Arn, 474 U.S. 140 (1985); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984).